IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| MYONG JA JHANG et al, | : |
| Plaintiffs, | : CIVIL ACTION |
| v. | : NO. 13-6359 |
| PAUL DONG UK KIM et al, | : |
| Defendants. | : |

MEMORANDUM

**TUCKER, J.** June 21, 2021

Before the Court are Defendants' Motion for Summary Judgment (ECF 295) and Plaintiffs' Response in Opposition (ECF 296). Upon careful consideration of the Parties' submissions and for the reasons outlined below, Defendants' motion is granted.

**I.  FACTUAL AND PROCEDURAL BACKGROUND[1]**

This lawsuit is the unhappy result of a purported long con. Plaintiffs' Amended Complaint alleges fourteen "schemes" by the defendants. Some of these are allegations that the defendants directly induced payments from Plaintiffs. Others allege that entities controlled by the defendants were used to divert these monies towards other businesses. For reasons of clarity and length, these allegations will be condensed. While a clear chronology is not provided by either side, the initial investments at the center of this lawsuit happened during a span of time from roughly January 2007 to 2013. Pls.' Am. Compl. (ECF 280) ¶ 192. Plaintiffs state that they first became aware of the alleged fraud in either November 2011 or February 15, 2012. *See Id*. at ¶¶

---

[1] This section draws primarily from Defendants' Statement of Undisputed Material Facts (ECF 295). Where relevant facts are disputed, this order will cite to Plaintiffs' Response to the Statement of Undisputed Material Facts (ECF 296) or the Amended Complaint (ECF 280).

1

185-187 (stating that Plaintiffs "became concerned about" their investments in November 2011, but also stating that "at all times prior to" February 15, 2012, they believed their investments would result in retirement funds).

Plaintiffs Kathleen Chung, a real estate agent, and Myong Jhang, a nurse, both met Defendant Kyung Soon Kim ("Soon Kim") while seeking real estate investments for their retirement.[2]

Soon Kim was ordained as a minister in Korea in 1995, and moved to the United States in 2002. He was a member of the General Assembly of the United Korean Presbyterian Overseas Church. Soon Kim eventually joined the Philadelphia Presbytery of the Korea Presbyterian Church (PPKPC), which was founded by Defendant Paul Dong Uk Kim ("Paul Kim"). Soon Kim changed the name of the educational institution associated with PPKPC, the Pennsylvania Theological School, to Global Mission Theological School (GMTS) on January 9, 2009.

GMTS, one of the key entities in the series of events that led to this lawsuit, is located in Melrose Park, Pennsylvania. The entity was an actual school with staffers. The institution charged tuition, but did not give degrees.

GMTS also managed a theological and religious philosophy school and offered an SAT prep program, a divinity program, and an ESL school. Defendants contend that GMTS and Soon Kim did not own or sell property, and that GMTS did not have a business relationship with Henderson Christian University (HCU)—despite Soon Kim attempting to buy HCU. Plaintiffs dispute this and say that these connections constituted "many and significant business relationships" with HCU. Pls.' Resp. Mot. Summ. J. (ECF 296) ¶ 24.

---

[2] Neither document explains who the third Plaintiff, Dong Il Kim, is, or how he met the defendants. The complaint states that he currently is a resident of Philadelphia. Pls.' Am. Compl. (ECF 280) ¶ 10.

GMTS taught exclusively foreign students, most of whom were on visas to attend an educational institution in the U.S. From 2014 to 2016, it was accredited as an ESL school.

HCU, another of the Defendant entities, ordained pastors for the General Assembly of the United Korean Presbyterian Overseas Church. Soon Kim received an honorary doctorate from HCU for introducing students to the school, which trained the students as pastors. Defendants contend that Soon Kim and GMTS did not contribute money to HCU. Plaintiffs dispute these points and counter that HCU was "an entity to issue fake degrees for profit to fake pastors" and note that HCU is not listed in the General Assembly organization chart provided in an exhibit from Defendants. *See* Pls.' Resp. Mot. Summ. J. (ECF 296) ¶ 31; Def's Mot. Summ. J. (ECF 295-4) Ex. 6. However, Plaintiffs do not provide a citation to their claim that HCU was a fictious organization.

World Evangelical Mission, another Defendant entity, was operated by Paul Kim and performed missionary work. Soon Kim succeeded Paul Kim as president.

On January 9, 2009, Plaintiffs Chung and Jhang were named as officers in the bylaws of GMTS. Soon Kim sought to expand businesses in Atlanta, North Carolina, and Los Angeles with Chung and Jhang. The two plaintiffs also formed a business agreement with Defendant Paul Kim to buy property. A check from GMTS was used to pay $50,000 and another $7,500 for a business deal where Jhang and Chung would be receiving property. The money was not returned after the deal fell through.

The parties were also entangled in two proposed real estate purchases in the southeast. The first was in Cramerton, North Carolina, where Soon Kim was to operate a school, while Jhang would own the real estate housing the school and church. The proposal, which was paid by Soon Kim to Dong Kim using a $50,000 GMTS check, fell through. Paul Kim sold the property

to another person and refused to give the $50,000 back to Soon Kim. A second venture involved Soon Kim, Chung, Jhang, and Paul Kim making a real estate purchase in Atlanta. Soon Kim paid Paul Kim $30,000 in August 2016, but the two subsequently severed ties.

Another of the business ventures implicated in this suit was Jabez Mission, Inc., a food distribution business. The venture was incorporated by Soon Kim, Chung and Jhang, who all shared equal financial control despite the lack of a written agreement. All three had the ability to write checks. The bank account for the entity was opened by Soon Kim, Jhang and Chung in May 2008. Chung invested in Jabez, but Jabez also transferred $99,000 on September 11, 2008 to Chung's husband in Korea. Jabez also paid Jhang multiple times. Jhang wrote checks for $100,000 and $160,000 in July and August to Jabez. The company was separate from GMTS, and was created about a year before GMTS was established in 2009. It had about 30 customers, and closed on September 30, 2009.

Prior to 2010, Defendant Soon Kim and Plaintiffs Chung and Jhang operated businesses together, including an Allentown, PA gas station—held 50/50 between Chung and Soon Kim— and Jabez. The gas station was sold in 2011 for a loss.

Another of the entities implicated in this lawsuit was KEU Corp., which was created by Chung. Chung listed Jhang as the president of KEU in order to obtain a $276,345 loan from TD Bank in February 2009. Jhang wrote a $240,000 check to Jabez from the loan. Jhang's signature for the TD Bank loan, according to Defendants, was not coerced or the result of deception. Rather, Jhang believed that Chung, Soon Kim and herself would invest in Jabez as equal partners, and that schools in North Carolina, Virginia, and Georgia would be opened. Plaintiffs dispute this claim and say that Soon Kim lied to Jhang. Pls.' Resp. Mot. Summ. J. (ECF 296) ¶ 79.

On October 31, 2013, Plaintiffs filed their complaint in this matter. It alleged that Defendants snookered Plaintiffs into a series of investments under false pretenses orchestrated to bleed them out of their retirement funds, and that these supposed schemes constituted an enterprise under the Racketeer Influenced and Corrupt Organizations Act (RICO). Plaintiffs claim that $3.26 million was stolen in this purported scheme, much of it gambled away at Sands Casino in Bethlehem, Pennsylvania from 2012 to 2018. Pls.' Resp. Mot. Summ. J. (ECF 296) ¶¶ 105-107. Defendants seek summary judgment in their favor, chiefly contending that Plaintiffs have failed to allege predicate acts under the RICO statute. Defs.' Mot. Summ. J. (ECF 295) 17.

## II. LEGAL STANDARD

Summary judgment can only be awarded when "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *Liberty Mut. Ins. Co. v. Sweeney*, 689 F.3d 288, 292 (3d Cir. 2012). To defeat a motion for summary judgment, there must be a factual dispute that is both genuine and material. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247–49, (1986); *Dee v. Borough of Dunmore*, 549 F.3d 225, 229 (3d Cir. 2008). A material fact is one that "might affect the outcome of the suit under the governing law[.]" *Anderson*, 477 U.S. at 248. A dispute over a material fact is "genuine" if, based on the evidence, "a reasonable jury could return a verdict for the nonmoving party." *Id.*

The movant bears the initial burden of demonstrating the absence of a genuine dispute of a material fact. *Goldenstein v. Repossessors Inc.*, 815 F.3d 142, 146 (3d Cir. 2016). When the movant is the defendant, she has the burden of demonstrating that the plaintiff "has failed to establish one or more essential elements of her case." *Burton v. Teleflex Inc.*, 707 F.3d 417, 425 (3d Cir. 2013). If the movant sustains her initial burden, "the burden shifts to the nonmoving

party to go beyond the pleadings and come forward with specific facts showing that there is a genuine issue for trial." *Santini v. Fuentes*, 795 F.3d 410, 416 (3d Cir. 2015) (internal quotation marks omitted) (quoting *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)).

At the summary judgment stage, the court's role is not to weigh the evidence and determine the truth of the matter, but rather to determine whether there is a genuine issue for trial. *See Anderson*, 477 U.S. at 249 (citations omitted); *Jiminez v. All Am. Rathskeller, Inc.*, 503 F.3d 247, 253 (3d Cir. 2007). In doing so, the court must construe the facts and inferences in the light most favorable to the non-moving party. *See Horsehead Indus., Inc. v. Paramount Commc'ns, Inc.*, 258 F.3d 132, 140 (3d Cir. 2001). Nonetheless, the court must be mindful that "[t]he mere existence of a scintilla of evidence in support of the plaintiff's position will be insufficient; there must be evidence on which the jury could reasonably find for the plaintiff." *Anderson*, 477 U.S. at 252.

III. **ANALYSIS**

Throughout the Complaint, Plaintiffs allege a labyrinthine set of facts that—if true—would constitute a profound outrage. Men of the cloth using their cultural and religious affinity to bilk members of their own congregation out of their life savings over the course of nearly seven years. The fatal problem with the Complaint is that it has not presented facts which would allow for a jury to find a RICO violation, as will be detailed below. The RICO claims are based on a series of alleged acts of mail and wire fraud. However, none of these alleged acts meet the statutory requirements of either the wire or mail fraud statutes. Because of this failure to allege instances of mail and wire fraud, there is no basis for the RICO claim, and therefore summary judgment will be granted to Defendants on all claims of Count I of the Complaint. Furthermore,

this Court's continued jurisdiction over the matter is discretionary without the RICO count. Therefore, the rest of the complaint is also dismissed.

### A. Plaintiffs Have Failed to Demonstrate RICO Predicate Acts Under § 1962

This motion is decided under the preponderance of evidence standard. Although Defendants contend that the burden of proof should be beyond a reasonable doubt, precedent dictates that in a civil RICO case the court should use the lower standard of proof— preponderance of the evidence. *See United States v. Local 560 of Int'l Bhd. of Teamsters*, 780 F.2d 267, 279 n.12 (3d Cir. 1985) ("While we recognize that the defendants in such [RICO] actions have significant interests at stake (i.e., financial, occupational, and reputational), these interests are not sufficiently compelling to trigger a more stringent burden of proof"). Yet, the Plaintiffs fail to properly allege RICO claims even under this lower standard.

The RICO claims in this lawsuit fail due to Plaintiffs' inability to present facts that would lead a jury to conclude that Defendants engaged in conduct which constitutes "racketeering activity" under 18 U.S.C. § 1962. Plaintiffs specify wire and mail fraud as the 18 U.S.C. § 1961 RICO predicate acts of the numerous "schemes" they allege Defendants defrauded them under. A claim of mail fraud generically requires "establish[ing] beyond a reasonable doubt (1) the defendant's knowing and willful participation in a scheme or artifice to defraud, (2) with the specific intent to defraud, and (3) the use of the mails or interstate wire communications in furtherance of the scheme." *United States v. Antico*, 275 F.3d 245, 261 (3d Cir. 2001). For wire fraud, a civil RICO complaint "must allege interstate use of the wire for each predicate act." *Stanley v. IBEW*, 207 Fed.Appx. 185, 189 (3d Cir. 2006). Allegations of wire fraud based on telephone communications need evidence that the communications crossed state lines. *Brice v. Hoffert*, No. 5:15-CV-4020, 2016 WL 4766301, at *4 (E.D. Pa. Sept. 13, 2016), *rev'd on other*

*grounds by Brice v. Bauer*, 689 F. App'x 122 (3d Cir. 2017). Emails can satisfy the interstate commerce element without proof of crossing state lines. *United States v. Fumo*, No. CRIM.A.06-319, 2009 WL 1688482, at *8 (E.D. Pa. June 17, 2009).

Plaintiffs' case rests on a contention that the dizzying number of Defendant business entities, financial transactions, and individuals identified in their complaint—from GMTS to Jabez Mission Inc., to Henderson Christian—were part of a deliberate enterprise to swindle them. However, Plaintiffs fail to allege facts showing interstate activity connected to the vast majority of the schemes recounted in the complaint; the rare exceptions involve conduct not directed at Plaintiffs. They also fail to demonstrate the degree of intent to defraud Plaintiffs through the business transactions that is necessary for those claims to be characterized under the RICO statutes. Generally, the organization of the sections to follow is based on the order these schemes are alleged throughout the complaint, which unfortunately does not present a model of narrative clarity. Some are combined for brevity.

    1. *The PTS/GMT School Scheme*

For the first scheme relating to the main entity at issue, GMTS, Plaintiffs cite multiple checks paid by Plaintiffs Jhang, Kathleen Chung, and Dong Il to the defendants, as well as a subsequent string of bad checks from various defendants to Plaintiffs. Pls.' Am. Compl. (ECF 280) ¶¶ 57-68. The checks that are described in paragraphs 57, 59, and 60 were issued in Pennsylvania and withdrawn or deposited at Pennsylvania banks. Plaintiff Chung's checks as described in paragraph 61 of the complaint appear to have been deposited or cashed in Cherry Hill, NJ. Pls.' Compl. (ECF 1-3) Ex. 8. However, the complaint fails to demonstrate whether those checks were used by Defendants towards the schemes alleged, or even if the Cherry Hill marked checks were mailed or wired between states.

The checks described in paragraph 62 of the complaint were all executed and deposited or cashed in Pennsylvania, except for number 8093, cashed in Los Angeles. Pls.' Compl. (ECF 1-3) Ex. 9. Still, the complaint does not describe how this cashed check was used, or by whom. Therefore, the specific check has not been connected to the alleged scheme.

The checks described in paragraph 63 of the complaint again lack evidence that the funds were taken out of or across state lines. Pls.' Compl. (ECF 1-3) Ex. 10.

Plaintiffs describe in paragraph 64 a promissory note, dated January 17, 2011, which is meant to prove that Defendant Kyung Kim took $300,000 from Plaintiff Dong Il. But there is no evidence given that the implied transaction actually occurred, how the money was moved, whether it was mailed or wired for the purposes of the applicable fraud statutes, or if there was a tie to interstate commerce. Pls.' Compl. (ECF 1-3) Ex. 11.

Plaintiffs go on to describe a series of bad checks from Defendants in paragraphs 65-68. Of those checks, only six were even made out to any of the Plaintiffs—specifically, to Plaintiff Dong Il, found in paragraphs 65 and 66. There is no evidence provided that any of the bad checks identified were sent across state lines. Pls.' Compl. (ECF 1-3) Ex. 12 and 13. Paragraphs 67 and 68 describe a series of bad checks that were not even written to any of the Plaintiffs, and which again are not connected in Plaintiffs' documents to interstate wire communications.

Paragraph 70 of the complaint describes defendants seeking to assist two nonparties that are barely connected to Plaintiffs. Pls.' Compl. (ECF 1-3) bounced check # 1151 Ex. 14.

*2. The GMTS/Jabez Investment Scheme*

Plaintiffs allege the entity of Jabez Mission, Inc. was part of this overarching scheme to defraud them. Among the alleged transactions is one where Plaintiff Chung communicated internationally with her husband to have him wire funds from Korea to either the Jabez account

9

or directly to Chung. Pls.' Am. Compl. (ECF 280) ¶ 76; Pls.' Compl. (ECF 1-3) Ex. 19. However, despite the evidence of an international transaction, a non-party—not Defendants—made this transfer, and because of the lack of evidence that Defendants had induced this transaction through deception, this is not a valid predicate act.

   3. *The PTS/The GMT School/WEM, 1080 Sparrow, and GMT/Jabez/KEU Corp Schemes*

In these supposed schemes, Plaintiffs have alleged actions that are almost entirely comprised of face to face interactions between the parties and with financial institutions, all in Pennsylvania. The one exception is noted in paragraph 83 of the complaint, where documents were faxed by a real estate company to Plaintiff Chung. The document appears to be faxed to Pennsylvania real estate representatives, from a Pennsylvania company. Pls.' Compl. (ECF 1-3) Ex. 22. The KEU Corp. allegations do mention mail or wire activity, but the Complaint does not directly connect the entity to fraudulent activity.

   4. *The Stanton University Atlanta – Georgia, Harvest Mission, and Henderson Christian University Schemes*

In this group of schemes related to the creation of ostensible religious institutions outside of Pennsylvania, Plaintiffs are still unable to demonstrate appropriate predicate acts. In paragraphs 92-101 of the Complaint, there are no specific allegations of mailing or use of interstate wire communications. *See* Pls.' Compl. (ECF 1-3) Ex. 24 and 25. The exhibits associated with the allegations regarding Harvest Mission show some faxes, but again no evidence that they were sent from any of the Defendants, or that Exhibit 27, corrections to a document submitted to the North Carolina Secretary of State, were transmitted by mail or wire communications. Pls.' Am. Compl. (ECF 280) ¶¶ 102-115; Pls.' Compl. (ECF 1-3) Ex. 27. The

Henderson Christian University allegations again fail to illustrate mail or wire fraud, and simply describe the establishment of a nonprofit and a lease. Pls.' Am. Compl. (ECF 280) ¶¶ 116-118.

   5. *Stanton University/Westminster University, and World Evangelical Mission Schemes*

The allegations under the Stanton/Westminster University heading simply describe the setting up of a school. They do not connect the establishment of the school to the use of postal mail or wires to further a fraudulent scheme, and the documents identified as establishing the ownership of Stanton University do not involve Plaintiffs. *See* Pls.' Am. Compl. (ECF 280) ¶¶ 120-121; Pls.' Compl. (ECF 1-3) Ex. 31 and 32. The payments detailed between the Defendants in paragraphs 122-125 have a merely tangential relation to Plaintiffs, and the allegations rely on GMTS being described as a "RICO enterprise", a designation Plaintiffs do not actually substantiate. Similarly, the allegations regarding the World Evangelical Mission ("WEM") entity simply assert that WEM is a "RICO enterprise", and provide no evidence that the established entity furthered an alleged scheme, or that *money from the plaintiffs* was taken to further this entity. Pls.' Am. Compl. (ECF 280) ¶¶ 130-132.

   6. *Henderson Christian University/Paul Kim/Belk, and Hee Jung Park/K & P Development Schemes*

Plaintiffs' allegations regarding the purchase of Henderson Christian University, another of the educational institutions the parties tried to establish, merely demonstrate that Plaintiffs Chung and Jhang were involved in Defendant Paul Kim's attempts to purchase HCU. The transactions Chung alleges were made in order to fund a down payment for the property were not made via postal mail or interstate wire. The covering of Kim's bounced check by Chung also did not involve interstate wires. The letter from HCU's president, detailed as Exhibit 42 of the complaint, seeks students, but not investments, and does not connect to the alleged attempt to

induce Plaintiffs to invest in the Defendant entities. Pls.' Am. Compl. (ECF 280) ¶¶ 133-142. This presents difficulties given the allegation is that money was taken from Plaintiffs.

Meanwhile, the alleged events around the "Hee Jung Park/K&P Development Scheme" also fail to allege acts of interstate wire or mail fraud, because the events described all happened in Pennsylvania. Furthermore, paragraphs 149-152 rely on Defendants allegedly submitting false tax returns relating to the entities. However, the allegation that a third party entity was defrauded makes it difficult for Plaintiffs to allege a RICO predicate claim on the basis of the act. *See Anza v. Ideal Steel Supply Corp.*, 547 U.S. 451, 458 (2006) ("The cause of [Plaintiff] Ideal's asserted harms, however, is a set of actions (offering lower prices) entirely distinct from the alleged RICO violation (defrauding the State [tax authority]).").

  *7. GMT/General Assembly/PPKPC Scheme*

Plaintiffs here describe activities—from the creation of documents regarding the ownership of GMTS to the recruitment of foreign students from South Korea, among other acts—that are largely unrelated to and not directed at Plaintiffs. The activities fail to demonstrate mailed or wired interstate communications furthering a scheme to defraud Plaintiffs. Pls.' Am. Compl. (ECF 280) ¶¶ 153-174.

  *8. Eric Wilenzik's Scheme*

Plaintiffs allege here that an inaccurate student list from GMTS was provided to an arm of the Department of Homeland Security. *Id.* at ¶ 178. The provision of these documents is again unrelated to a purported scheme to defraud *Plaintiffs*. Furthermore, the claim that attorney Eric Wilenzik assisted Defendants Kyung Kim and the General Assembly and PPKPC Defendants in violating court orders from the Montgomery County Court of Common Pleas barring the

expansion of GMTS, is again unrelated to *claims that money was stolen* from Plaintiffs. *Id.* at ¶¶ 179-182.

Because of the Plaintiffs' inability to appropriately plead the predicate acts of mail fraud and wire fraud as defined under 18 U.S.C. § 1961 of the RICO statute, they failed to make a proper claim for violation of 18 U.S.C. § 1962, and as such this Court does not need to reach the question of civil remedies as detailed in 18 U.S.C. § 1964. The Court grants summary judgment to Defendants on Count I.

### B. State Law Claims

Given summary judgment on Count I, Plaintiffs' Amended Complaint is left with seven remaining counts; Counts II-VII asserting state law claims, and Count VIII seeking a declaratory judgment. Under 28 U.S.C. § 1367(c)(3), district courts can decline to exercise supplemental jurisdiction over a claim if "the district court has dismissed all claims over which it has original jurisdiction." Whether a district court decides to exercise supplemental jurisdiction once the original jurisdiction claim[s] are dismissed is "purely discretionary." *Carlsbad Tech., Inc. v. HIF Bio, Inc.*, 556 U.S. 635, 639, (2009). In making this decision, a district court should consider "judicial economy, convenience and fairness to litigants." *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726, (1966) (holding that "[I]f the federal claims are dismissed before trial . . . the state claims should be dismissed as well.")

Looking at the remaining claims with an eye to the *Gibbs* factors, none weigh in favor of this Court continuing to handle the lawsuit. Factor one, judicial economy, leans in favor of dismissing the state law claims. As Defendants note in their motion, there is a civil proceeding in the Philadelphia Court of Common Pleas; *Jhang et al v. Park*, Case No. 180300597, which arose from the same alleged fraudulent conduct Plaintiffs attempted to refashion into a RICO case in

this action. Def's Mot. Summ. J. (ECF 295) 37-38. Plaintiffs are involved in that case, as well as key Defendants Hee Jung Park and Kyung Soon Kim. *See* Def's Mot. Summ. J. (ECF 295-6) Ex. 27. In response to the mention of this case, Plaintiffs argue that the state law claims are properly before this Court because the state level case only pertains to the KEU Corp. issues and not the other entities described in the complaint. *See* Pls.' Resp. Mot. Summ. J. (ECF 296) 25. This may be true. However, Plaintiffs' response on this issue does not address how or why this Court should continue to hear their state law claims should summary judgment to be granted on the RICO claims, as this Court has decided to do.

Factor two, convenience, is not impacted by the dismissal of this lawsuit; the state law claims can be pursued in the same area as this venue. Factor three, fairness to litigants, is also unaffected; the possibility that the RICO claims in this lawsuit could be dismissed was part and parcel of the outcomes Plaintiffs should have contemplated when filing this lawsuit. Furthermore, the fact that discovery and depositions have been taken in this matter has no bearing on whether the district court is obligated to continue to hear the case without the RICO claims. *See Annulli v. Panikkar*, 200 F.3d 189, 202 (3d Cir. 1999) *overruled on other grounds by Rotella v. Wood,* 528 U.S. 549, (2000) ("[Plaintiff] argues that two years of litigation, fifteen pages of court docket, 1,800 pages of deposition testimony, and 2,800 pages of discovery documents militate in favor of retaining jurisdiction over his case, especially as he was on the eve of trial when the Defendants filed their motion for summary judgment. Although district courts have chosen to retain pendent jurisdiction in similar situations, courts of appeals have acknowledged the authority of district courts to refuse to do so. Here, we do the same."). When a federal claim fails, the district court has wide latitude to drop supplemental jurisdiction state law claims. *See Kach v. Hose*, 589 F.3d 626, 650 (3d Cir. 2009) (affirming a district court's

14

declination of supplemental jurisdiction over state law claims attached to a § 1983 claim dismissed as being time barred).

Because the federal claims in this suit fail, and this is a situation where a district court is empowered to decline to exercise supplemental jurisdiction over any remaining state law claims, we need not address the question of statute of limitations on the state law claims, or whether Plaintiffs are entitled to a declaratory judgment. Counts II-VIII are dismissed.

## IV. CONCLUSION

For the foregoing reasons, summary judgment for Defendants is entered on Count I. As this Court is declining to exercise supplemental jurisdiction on Counts II-VIII, those claims are dismissed without prejudice to an action filed in state court. The statute of limitations for those state claims was tolled throughout the pendency of this action, and will be for another 30 days. *See* 28 U.S.C. § 1367(d) ("The period of limitations for any claim . . . voluntarily dismissed at the same time as or after the dismissal of the claim under subsection (a), shall be tolled while the claim is pending and for a period of 30 days after it is dismissed unless state law provides for a longer tolling period.")

An appropriate order follows.